UNITED STATES of America, Plaintiff,

v.

Oscar VARELA–CRUZ, Defendant.

United States of America, Plaintiff,

v.

Manuel A. Martinez–Talavera; Moises Hernandez–Martinez; Elvin Martinez–Cabrera; Adrian Colon–Aviles, Defendants.

United States of America, Plaintiff,

v.

Eddie S. Melendez–Melendez; Hector M. Calderon–Reyes, Defendants.

United States of America, Plaintiff,

v.

Jose Arturo Lopez–Lopez; Miguel A. Torres–Rivera, Defendants.

United States of America, Plaintiff,

v.

Lauro Melendez–Collazo; Jose Rafael Collazo–Melendez; Hector M. Calderon–Reyes, Defendants.

United States of America, Plaintiff,

v.

Jesus Gonzalez–Lopez; Miguel A. Torres–Rivera; Julio Maldonado–Rosado, Defendants.

United States of America, Plaintiff,

v.

Luis Santana–Mendoza; Manuel Ortiz–Garcia; Edwin O. Otero–Vazquez, Defendants.

Criminal Nos. 98–278(JAF), 98–281(JAF), 98–286(JAF), 98–288(JAF), 98–283(JAF), 98–294(JAF), 98–295(JAF).

United States District Court, D. Puerto Rico.

Sept. 2, 1999.

Lydia Lizarribar–Buxo, Hato Rey, PR, Manuel Martinez–Umpierre, Arecibo, PR, for Oscar Varela–Cruz.

Efren T. Irizarry–Colon, Arecibo, PR, for Manuel A. Martinez–Talavera.

Joseph C. Laws, Federal Public Defender, San Juan, PR, for Moises Hernandez–Martinez.

Roberto Roldan–Burgos, Rio Piedras, PR, for Elvin Martinez–Cabrera.

Ramon M. Gonzalez–Santiago, Santurce, PR, for Adrian Colon–Aviles.

Nector Robles–Abraham, Fajardo, PR, for Eddie S. Melendez–Melendez.

Luis F. Abreu–Elias, Hato Rey, PR, for Hector M. Calderon–Reyes.

Efren T. Irizarry–Colon, Arecibo, PR, for Jose Arturo Lopez–Lopez.

Marlene Aponte–Cabrera, San Juan, PR, for Miguel A. Torres–Rivera.

Efren T. Irizarry–Colon, Arecibo, PR, for Jesus Gonzalez–Lopez, defendant.

Marlene Aponte–Cabrera, San Juan, PR, for Miguel A. Torres–Rivera.

Luis F. Abreu–Elias, Hato Rey, PR, for Julio Maldonado–Rosado.

Francisco M. Dolz–Sanchez, San Juan, PR, Laura Maldonado–Rodriguez, San Juan, PR, for Luis Santana–Mendoza.

Francisco M. Dolz–Sanchez, San Juan, PR, for Manuel Ortiz–Garcia.

Rafael F. Castro–Lang, San Juan, PR, for Edwin O. Otero–Vazquez.

## OPINION AND ORDER

FUSTE, District Judge.

Defendants, Oscar Varela–Cruz (No. 98–278); Manuel A. Martínez–Talavera, Moisés Hernández–Martínez, Elvin Martínez–Cabrera, and Adrián Colón–Avilés (No. 98–281); Eddie Meléndez–Meléndez and Héctor M. Calderón–Reyes (No. 98–286); José A. López–López (No. 98–288); Lauro Meléndez–Collazo, José Rafael Collazo–Meléndez, and Héctor M. Calderón–Reyes (No. 98–293); Jesús González–López, Miguel A. Torres–Rivera, and Julio Maldonado–Rosado (No. 98–294); Luis Santana–Mendoza, Manuel Ortiz–García, and Edwin O. Otero–Vázquez, (No. 98–295), are charged with conspiracy to adulterate milk by dilution through the addition of water and salt, in violation of the Federal Food, Drug and Cosmetic Act ("FFDCA"). 18 U.S.C. § 871, 21 U.S.C. §§ 331(a) and 333(a)(2). Federal jurisdiction is premised upon interstate commerce as defined in 21 U.S.C. § 321(b).

Defendants move to dismiss challenging this court's federal criminal subject matter jurisdiction in this case.

On August 18, 1999, the Judges in this District jointly held a hearing on the jurisdictional issue. Being away from the District, the undersigned did not participate in the oral argument. Nonetheless, previous to the hearing, we circulated this Opinion and Order to share our views on the subject with the other Judges, who filed a joint opinion yesterday, September 1, 1999. We join in the result reached by the other Judges but under the following analysis.

## I.

### Relevant Background

The Puerto Rico milk industry is regulated by the Milk Industry Regulation Office ("ORIL"), a division of the Department of Agriculture. The basic process by which milk is produced in Puerto Rico is that farmers process fresh, raw milk which processing plants' employees pick up and transport to their sites. Prior to accepting the milk for transport, the drivers perform a number of tests to determine preliminarily whether the milk is of an acceptable quality. The drivers then complete a report which includes the volume of milk accepted and transport the suitable milk to the processing plant. Upon arrival at the plant, laboratory technicians perform extensive testing on samples of the milk in order to ensure its quality and purity in accordance with the rules and regulations enacted by the ORIL. The plants then process the milk, storing it in large cylinders. The milk is tracked from the farm to final distribution using numbers assigned to the trucks and then numbers assigned to the cylinders in which it is stored. The plants further bottle and then distribute the milk for consumption. Upon distribution, the processing plant compensates the farmers in accordance with the volume of milk accepted for distribution by ORIL.

The Prosecution alleges that during the periods specified in the indictment, Defendants adulterated the milk and supplied it to the Vaquería Tres Monjitas and Suiza Dairy milk processing plants. The Prosecution maintains that either the milk producers or the truck driver would obtain a reading of the liters of milk contained in the tanker truck and then take the samples necessary for laboratory testing. At this point, the Prosecution alleges that the Defendants conspired to determine the amount of water and salt which was added to the tanker. The drivers would then record the new liter content and transport the adulterated milk to the processing plants by refrigerated trucks. At the dairy processing plants, Vaquería Tres Monjitas or Suiza Dairy employees perform laboratory tests on the unadulterated sample of the milk and process the alleg-

edly adulterated milk. This further, more extensive testing was done only on the pre-extracted sample. Thus, the samples on which the tests were performed did not represent the actual contents of the tanker trucks. Vaquería Tres Monjitas or Suiza Dairy then supplied the processed, adulterated milk for distribution.

Since the practice in Puerto Rico is not to compensate farmers and producers until after the milk had been processed and distributed, the Prosecution alleges that Defendants were full members of the adulteration conspiracy. Finally, the Prosecution submits numerous receipts showing that during the months alleged in the indictment, Vaquería Tres Monjitas and Suiza Dairy made sales to Airport Catering Services ("Airport Catering"), Sky Catering Services, Inc. ("Sky Catering"), and the United States Naval Station at Sabana Seca ("Navy Station"). The Prosecution maintains that the adulterated milk entered into interstate commerce via these entities.

Defendants, both collectively and singly, move to dismiss the indictment for lack of federal criminal subject matter jurisdiction. The specific allegations are that this court lacks jurisdiction because: (1) there has been no showing that milk provided by Defendants was distributed into the stream of interstate commerce; (2) there is no federal jurisdiction because the jurisdiction presumption stated in 21 U.S.C. § 379(a) does not apply, since it was enacted after the facts charged in the indictment;[1] (3) the presumption of connection with interstate commerce is defeated by

the facts of this case; (4) the milk was not in the stream of commerce within federal standards; (5) the offense alleged is a crime under the laws of Puerto Rico and should be prosecuted as such; (6) premising jurisdiction upon the salt being in interstate commerce is inconsistent with the indictment; and (7) there is no jurisdiction under the Commerce Clause because there is no showing of a genuine, legitimate federal interest.[2]

## II.

### *Fed.R.Crim.P. 12(b)(1)*

■ A motion to dismiss a criminal prosecution for lack of federal criminal subject matter jurisdiction must be presented to the court for analysis and disposition prior to trial. Fed.R.Crim.P. 12(b)(1). Since we are not privy to the developed factual scenario that the government expects to present to satisfy the jurisdiction threshold, we will accept all well-pleaded facts as true, drawing all necessary inferences in favor of the government as is customary in motions for judgments of acquittal based on jurisdictional arguments. *Cf.* Fed.R.Crim.P. 29.

## III.

### *Jurisdiction Premised Upon Interstate Commerce*

■ The main contention in all the motions is that this court lacks jurisdiction because there is no interstate commerce connection. Defendants maintain that

1. The recently-enacted section 379(a) provides that in enforcement actions under the FFDCA, jurisdiction "shall be presumed to exist." 21 U.S.C. § 379(a). The indictments charge conspiracies to adulterate milk spanning from August 1992 until June 1998. Congress approved amendment of section 379(a) to include food and drugs on November 21, 1997 and the statute went into effect ninety days thereafter. Thus, jurisdiction as to certain Defendants, premised upon section 379(a), would violate the Ex–Post–Facto Clause of the United States Constitution. U.S. Const., amend. I, § 9, cl. 3. Nonetheless,

we do not base our finding of federal jurisdiction upon section 379(a) and, therefore, there is no constitutional violation.

2. A few of the Defendants make a final argument concerning the container in which the salt was transported. This argument is baseless and not supported by the allegations. The issue concerning containers is whether the containers which held the adulterated milk were in interstate commerce. Defendants misunderstand the issue and we, therefore, decline to discuss their contention.

dairy farmers in Puerto Rico have a standing agreement with the milk processing plants to sell the raw milk after it is tested for fitness. At this point, Defendants contend that any economical benefit to or commerce with the farmers or truck drivers ends. Therefore, Defendants maintain that they were not involved in any activity affecting interstate commerce. We begin by analyzing this issue.

The purpose of the FFDCA is "to safeguard the consumer from the time the food is introduced into the channels of interstate commerce to the point that it is delivered to the ultimate consumer." *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964); *accord Kordel v. United States*, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948); *United States v. Cassaro, Inc.*, 443 F.2d 153, 156 (1st Cir.1971) *quoting United States v. Sullivan*, 332 U.S. 689, 696, 68 S.Ct. 331, 92 L.Ed. 297 (1948) (noting that sections of the FDCA are "element[s] of an overall scheme designed to regulate the interstate flow of goods 'from the moment of their introduction into interstate commerce' until 'the moment of their delivery to the ultimate consumer.'"). As eloquently enunciated by Justice Frankfurter:

> The purposes of this legislation thus touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words.

*United States v. Dotterweich*, 320 U.S. 277, 280, 64 S.Ct. 134, 88 L.Ed. 48 (1943). Defendants are charged with violating this Act by adulterating milk through dilution with water and salt and then introducing it into the stream of interstate commerce pursuant to 21 U.S.C. §§ 331(a) and 333(a)(2).

21 U.S.C. § 331(a) prohibits:

> (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded.

21 U.S.C. § 331(a). Section 331(a) is part of an overall scheme to "protect the interstate flow of goods from the moment of introduction [or delivery for introduction] into interstate commerce until the moment of delivery to the ultimate consumer." *United States v. Beech–Nut Nutrition Corp.*, 659 F.Supp. 1487, 1494 n. 8 (E.D.N.Y.1987), *citing United States v. Sullivan*, 332 U.S. 689, 696, 68 S.Ct. 331, 92 L.Ed. 297 (1948). Responsibility under this section is shared by all who participate in "furtherance of the transaction which the statute outlaws, namely, to put into the stream of interstate commerce adulterated or misbranded [products]." *United States v. Mitcheltree*, 940 F.2d 1329, 1349 (10th Cir.1991), *citing United States v. Abbott Laboratories*, 505 F.2d 565, 573 (4th Cir.1974).

21 U.S.C. § 333(a)(2) prohibits:

> (a)(2) ... if any person commits such a violation after conviction of him under this section has become final, or commits such a violation with the intent to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both.

21 U.S.C. § 333(a)(2). Scienter is not necessarily an element of the offense under section 333(a)(2). *Abbott Laboratories*, 505 F.2d at 565. Rather, the "intent to defraud or mislead" element is met upon a showing of proof that the defendant intended to defraud or mislead a government enforcement agency. *See, e.g., United States v. Arlen*, 947 F.2d 139 (5th Cir. 1991); *United States v. Cambra*, 933 F.2d 752 (9th Cir.1991); *United States v. Bradshaw*, 840 F.2d 871 (11th Cir.1988).

The jurisdictional provision of the FFDCA, 21 U.S.C. § 321(b), defines interstate commerce as:

(1) commerce between any State or Territory and any place outside thereof, and (2) commerce within the District of Columbia or within any other Territory not organized with a legislative body.

21 U.S.C. § 321(b). Section 321(a) defines commerce between any state and Puerto Rico as "interstate" commerce. 21 U.S.C. § 312(a).

The main issue is, thus, whether there is a interstate commerce element to provide federal jurisdiction. *United States v. Robinson*, 137 F.3d 652, 656 (1st Cir.1998). The First Circuit, in a similar food adulteration case, albeit based on a different section of the FFDCA, held that "the 'shipment in interstate commerce' requirement is satisfied when adulterated articles held for in-state sale contain ingredients shipped in interstate commerce." *United States v. An Article of Food*, 752 F.2d 11, 14 (1st Cir.1985), *citing United States v. Dianovin Pharmaceuticals, Inc.*, 475 F.2d 100, 102–03 (1st Cir.1973). In that case, the court held that since "the potassium nitrate added to the seized beverages was shipped in interstate commerce, those beverages clearly fall within the scope of statutory forfeiture jurisdiction." *Id.*

In this case, the Prosecution alleges that the milk was adulterated with ordinary table salt and diluted with water. The Prosecution further maintains, and Defendants do not offer proof to dispute, that table salt is not manufactured, packaged nor labeled in Puerto Rico. Therefore, the salt at issue in this case had to be imported to the island. Thus, this salt was within the stream of interstate commerce in the same way the potassium nitrate was within the stream of commerce in *An Article of Food*, 752 F.2d at 14. Even though the court in *An Article of Food* was dealing with different sections of the Federal Food, Drug and Cosmetics Act, sections 331(k) and 334(a)(1), there is substantial case law supporting a broad interpretation of the entire Act. *See Baker v. United States*, 932 F.2d 813, 816 (9th Cir.1991) (holding that "wholly intrastate manufac-

tures and sales of drugs are covered by [section 331(k) of the Act] as long as an ingredient used in the final product traveled in interstate commerce"); *United States v. Sanders*, 196 F.2d 895, 898 (10th Cir.1952) (finding violation of Act where appellee "was engaged in delivering such a [product] for introduction into interstate commerce"); *see also Wiesenfeld Warehouse Co.*, 376 U.S at 86, 84 S.Ct. 559 (general purpose of Act is to protect consumers); *United States v. 40 Cases, More or Less, of Pinocchio Brand 75% Corn, Peanut Oil and Soya Bean Oil Blended with 25% Pure Olive Oil*, 289 F.2d 343 (2nd Cir.1961), *citing Kordel*, 335 U.S. at 349, 69 S.Ct. 106 (stating that "[t]he statute must be read and applied broadly in order to effectuate its remedial purpose"). Moreover, the Supreme Court has stated:

> The Federal Food, Drug, and Cosmetic Act rests upon the constitutional power resident in Congress to regulate interstate commerce. Article 1, Sec. 8, cl. 3. To the end that the public health and safety might be advanced, it seeks to keep interstate channels free from deleterious, adulterated and misbranded articles of the specified types. *** It is in that interstate setting that various sections of the Act must be viewed.

*United States v. Walsh*, 331 U.S. 432, 434, 67 S.Ct. 1283, 91 L.Ed. 1585 (1947). Thus, "[t]he Act must be given a reasonable construction to effectuate its salutary purposes." *Sanders*, 196 F.2d at 898; *see also United States v. Vitasafe Corp.*, 345 F.2d 864, 870 (3rd Cir.1965) *citing United States v. Urbuteit*, 335 U.S. 355, 358, 69 S.Ct. 112, 93 L.Ed. 61 (1948) (stating that "that the problem of its enforcement 'is a practical one of consumer protection, not dialectics'"). It prohibits not only the introduction into interstate commerce of adulterated articles but also the delivery thereof for introduction into commerce. Given the expansive purposes and reading of the FFDCA and similar holdings under other sections, we find that the allegedly

280

adulterated milk was within interstate commerce.

Moreover, the Prosecution has produced receipts of the sale of the allegedly adulterated milk to Airport Catering, Sky Catering, and the Navy Station that supports the conclusion that the milk entered into interstate commerce. Sale of adulterated milk to these organizations strongly suggests that the product was shipped to places within the Continental United States. An integral function of Airport Catering and Sky Catering is to supply products to the airlines, including American Airlines. As such, it is highly probable that the allegedly adulterated products sold to these entities were transported to other states. Additionally, products supplied to the Navy Station are consumed by the U.S. Navy. Therefore, the milk supplied to Navy Station likely entered into interstate commerce. At this stage in the proceeding, the interstate commerce requirement is also satisfied through these entities.[3]

## IV.

### Solely Province of the State

■ Defendants allege that the crime of milk adulteration in Puerto Rico is strictly state-oriented violation and, therefore, there is no federal jurisdiction. To support this contention, Defendants cite a litany of state cases dealing with adulterated milk. Nonetheless, this claim is patently incorrect. The charge against Defendants is for violation of federal laws, 21 U.S.C. §§ 331(a) and 333(a)(2) and 18 U.S.C. § 871. Therefore, federal criminal jurisdiction exists by virtue of the charges coupled with the aforementioned interstate commerce element. The mere existence of state cases and parallel state statutes does

not preclude federal jurisdiction in this case.

## V.

### Improper Allegations in the Indictment

■ Defendants further contend that the indictment improperly alleges that the milk from the dairy farms would be distributed to the Continental United States and not that the milk was contaminated by a product shipped in interstate commerce. Therefore, they object to salt being the basis of jurisdiction alleging that it charges something other than that upon which the grand jury indicted. In essence, Defendants are alleging a material variance.

We find this argument to be without merit. "[A]n indictment or information 'is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against him which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Allard,* 864 F.2d 248, 250 (1st Cir.1989), *citing United States v. Serino,* 835 F.2d 924, 929 (1st Cir.1987), *quoting Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *see also United States v. Fisher,* 3 F.3d 456, 462–63 (1st Cir.1993), *quoting United States v. Tormos–Vega,* 959 F.2d 1103, 1115 (1st Cir.1992); *Beech–Nut Corp.,* 659 F.Supp. at 1498 (holding indictment sufficient where it tracked language of FFDCA section, identified dates of shipments, products shipped, and recipients of shipments); *United States v. J. Treffiletti & Sons,* 496 F.Supp. 53 (N.D.N.Y.1980). What is necessary is that the elements of the offense be clearly set forth. *Allard,* 864 F.2d at 250. Defendants' indictment clearly states the charged offenses, tracks the statutory language in stating the

3. As we find the interstate commerce jurisdictional requirement is satisfied by the salt and the intent that the adulterated product enter into interstate commerce, we need not address the milk container issue: Whether the milk was within interstate commerce because

it was bottled into containers that were in interstate commerce manufactured and labeled by Champion International Corporation, which is located in Morristown, New Jersey.

charges, and adequately informs Defendants of the offenses for which they are charged. "The test for sufficiency [sic] is not whether, in hindsight, the indictment or information could have been more complete, but rather whether it fairly identifies and describes the offense." *Allard,* 864 F.2d at 250 (internal citation omitted). We find that Defendants' indictment is sufficient and satisfies the requirements of Fed.R.Crim.P. 7(c).

## VI.

### Insufficient Showing of Federal Interest

Defendants' last contention is that there is no jurisdiction under the Commerce Clause because the Prosecution has failed to allege a genuine, legitimate federal interest. Defendants base this argument upon the recent retreat from an expansive reading of the commerce clause by the Supreme Court in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). However, that case is not controlling here[4].

■ First of all, in *Lopez,* the Court explicitly recognized Congress' power to regulate "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.,* 514 U.S. at 558, 115 S.Ct.

1624 (internal citations omitted). In the present case, it is undeniable that Congress' commerce clause power extends to the regulation of milk and the concomitant prohibition on adulterated milk that is shipped in interstate commerce. Thus, we need not address whether the activity "substantially affects" interstate commerce which was the issue the *Lopez* Court reached.

Secondly, the *Lopez* Court cited a number of activities which clearly affected interstate commerce, including restaurants utilizing substantial interstate supplies, *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); inns and hotels catering to interstate guests, *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); and production and consumption of homegrown wheat, *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The regulation of milk is closely akin to these examples in that it is part of a larger "regulatory scheme that could be undercut unless the intrastate activity were regulated." *Lopez,* 514 U.S. at 561, 115 S.Ct. 1624.

Moreover, unlike *Lopez,* where the Court found that "the possession of a gun in a local school zone is in no sense an economic activity that might, though repetition elsewhere, substantially affect any

---

4. Defendants have also raised the issue of the indictment merely alleging a *de minimus* effect on interstate commerce. We find this argument unavailing. *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624 ("[W]here a general regulatory statute bears a substantial relation to commerce, the *de minimus* character of individual instances arising under the statute is of no consequence."); *see, e.g., United States v. DiSanto,* 86 F.3d 1238 (1st Cir.1996) (holding that restaurant that bought and sold products produced outside of state satisfied interstate commerce requirement for federal arson statute); *United States v. Sweet,* 548 F.2d 198, 202 (7th Cir.1977) (holding that tavern that purchased beer from out-of-state vendor satisfied interstate commerce requirement in criminal explosives statute); Cf. *United States v. Butt,* 955 F.2d 77, 80 n. 2 (1st Cir.1992), *quotinq United States v. Rivera–Medina,* 845

F.2d 12, 15 (1st Cir.1988) (stating that "It is well settled that 'a realistic probability of a de minimis effect on 'interstate commerce' is all that need be shown to establish federal jurisdiction over extortionate crimes affecting interstate commerce."); *United States v. Murphy,* 480 F.2d 286, 290 (1st Cir.1973) (holding that de minimus impact on interstate commerce is enough to sustain jurisdiction pursuant to Federal Meat Inspection Act); *YMCA of the Pikes Peak Region, Inc. v. NLRB,* 914 F.2d 1442, 1447–48 (10th Cir.1990) *citing NLRB v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 226, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963) (per curiam) (noting that National Labor Relations Board has broad statutory jurisdiction in cases in which "an employer has more than a de minimus impact on the flow of interstate commerce").

sort of interstate commerce," *Id.*, 514 U.S. at 567, 115 S.Ct. 1624, the prohibition of adulterated milk is clearly an economic activity that can substantially affect interstate commerce. Since the present case is dissimilar, *Lopez* is not controlling here. We find the federal interest in protecting milk consumers is significant and sufficient.

## VII.

### *Conclusion*

In accordance with the foregoing, we **DENY** the motions to dismiss for lack of federal jurisdiction. This Opinion and Order disposes of *Docket Documents Nos. 53 and 54, Case No. 98–278; Docket Documents Nos. 59, 70, and 71, Case No. 98–281; Docket Documents Nos. 42 and 52, Case No. 98–286; Docket Documents Nos. 46, 54, and 56, Case No. 98–288; Docket Documents Nos. 40, 43, 51, 52, 54, 60, and 70, Case No. 98–288; Docket Documents Nos. 51, 52, 53, 61, 63, and 64, Case No. 98–294;* and *Docket Documents Nos. 67, 68, 69, 71, Case No. 98–295.*

**IT IS SO ORDERED.**